UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

TAMARA SUTTON, an individual,

Plaintiff,

vs. CASE NO.: 2:26-cv-2866

FIRSTSERVICE RESIDENTIAL PROPERTY MANAGEMENT, INC., f/k/a FIRSTSERVICE RESIDENTIAL FLORIDA, INC., a Florida profit corporation,

Defendant.
_________________________________________/

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, Tamara Sutton ("Plaintiff"), by and through undersigned counsel, sues Defendant, FirstService Residential Property Management, Inc., formerly known as FirstService Residential Florida, Inc. ("Defendant" or "FirstService"), and alleges:

**INTRODUCTION**

1. This is an action under the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq*. ("FMLA"), and the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101 *et seq.* ("ADA"), to recover damages and other relief for Defendant's unlawful interference with Plaintiff's FMLA restoration rights, retaliation for Plaintiff's exercise of FMLA rights, and discrimination committed by Defendant against Plaintiff because of her known association with her disabled minor child.

2. Plaintiff took approved leave under the FMLA to care for her disabled son. Before her scheduled return, Plaintiff timely submitted Defendant's return-to-work certification form identifying November 4, 2024, as her anticipated return date. Rather than restore Plaintiff to her position, Defendant kept her out of work for weeks while focusing on her son's disability, therapy schedule, transportation needs, and Plaintiff's expected caregiving obligations.

3. Plaintiff repeatedly sought to return to work, proposed scheduling flexibility that preserved her in-person responsibilities, and remained willing and able to resume her prior full-time, on-site schedule if Defendant declined the proposal. Defendant nevertheless instructed her not to report to work, failed to restore her to employment, and terminated her employment on December 11, 2024.

## JURISDICTION AND VENUE

4. This Court has subject-matter jurisdiction over these claims under 28 U.S.C. § 1331 because Plaintiff asserts claims arising under the FMLA and the ADA.

5. This Court has authority to grant legal and equitable relief under 29 U.S.C. § 2617 and 42 U.S.C. §§ 12117 and 2000e-5.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as the events or omissions giving rise to the claims alleged herein occurred within Collier County, Florida, where Plaintiff worked for Defendant.

7. This action is properly filed in the Fort Myers Division because Collier County, Florida, is within the Fort Myers Division of the Middle District of Florida.

## PARTIES

8. At all times pertinent, Plaintiff was and remains an individual who resides in Collier County, Florida, and who worked for Defendant in Naples, Florida.

9. Defendant is a property management company that provides property management and related services to condominium and homeowner associations in Florida, including The Isles of Collier Preserve in Naples, Florida.

10. Defendant has represented that Plaintiff was employed by FirstService Residential Florida, Inc., which is now known as FirstService Residential Property Management, Inc. Defendant was identified in the administrative charge as FirstService Residential, Inc., and the employing entity participated in the U.S. Equal Employment Opportunity Commission ("EEOC") proceedings through counsel.

11. At all times pertinent, Defendant was and remains a Florida profit corporation transacting business in Collier County, Florida.

12. At all times pertinent, Defendant employed at least fifteen (15) employees and was a covered employer within the ADA.

13. At all times pertinent, Defendant was a covered employer under the FMLA, Plaintiff was treated as an eligible employee under the FMLA when her leave began, and Defendant approved her request for FMLA leave.

14. At all times pertinent, Plaintiff had been employed by Defendant for at least twelve months and had worked at least 1,250 hours during the immediately preceding twelve-month period.

15. Plaintiff has retained counsel and is obligated to pay reasonable attorneys' fees and costs for services rendered in this action.

## COMPLIANCE WITH PROCEDURAL REQUIREMENTS

16. On or about April 24, 2025, Plaintiff signed and timely filed a Charge of Discrimination with the EEOC, Charge No. 510-2025-07013 ("Charge"), requesting that the Charge be dual-filed with the Florida Commission on Human Relations. The Charge alleged discrimination because of Plaintiff's association with her disabled child.

17. Defendant participated in the administrative proceedings and submitted a Position Statement through counsel addressing Plaintiff's Charge and identifying the employing entity as FirstService Residential Florida, Inc., now known as FirstService Residential Property Management, Inc.

18. On or about July 23, 2026, the EEOC issued a Determination and Notice of Rights.

19. All conditions precedent to the filing of this lawsuit have been satisfied, performed, or otherwise waived.

## GENERAL ALLEGATIONS

20. Beginning in approximately February 2022, Plaintiff worked as the Lifestyle Director at The Isles of Collier Preserve in Naples, Florida, first under a prior property management company.

21. When Defendant assumed management of The Isles of Collier Preserve on or about August 1, 2023, Plaintiff became Defendant's full-time employee and continued working as the community's Lifestyle Director.

22. Plaintiff developed a strong reputation with residents of The Isles of Collier Preserve. Residents repeatedly expressed approval of Plaintiff's work and continued contacting Plaintiff after her termination.

23. Plaintiff's duties as Lifestyle Director included planning, coordinating, and supporting community events; personally attending in-person lifestyle events requiring her presence; communicating with residents; coordinating schedules and facilities; and performing administrative and promotional responsibilities, including preparing newsletters, responding to emails, and updating the community website and social media.

24. At all times pertinent, Plaintiff reported to Defendant’s Property Manager, Michelle Churchill ("Churchill").

25. Plaintiff is the mother and caregiver of a minor child, H.B., who has autism and other medical conditions that require the care of specialists, frequent medical and therapy visits, transportation, and substantial parental assistance.

26. H.B.'s autism and related medical conditions constitute a disability within the meaning of the ADA, including because they substantially limit one or more major life activities and neurological or brain functions.

27. Defendant knew that H.B. was Plaintiff's son and knew of his disability and medical needs.

28. In or about July 2024, Plaintiff requested FMLA leave to care for H.B.

29. Defendant approved Plaintiff's FMLA leave beginning August 5, 2024, and identified November 3, 2024, as the scheduled end date of her approved leave.

30. Plaintiff's leave was taken to care for her son in connection with his serious health condition, including medical and therapy needs and related transportation and care.

31. On October 25, 2024, before the scheduled end of her approved leave, Plaintiff submitted Defendant's Return-to-Work Certification Form ("Return-to-Work Form") identifying November 4, 2024, as her anticipated return date and proposing temporary scheduling flexibility related to her son's ongoing medical and therapy needs.

32. The Return-to-Work Form proposed that Plaintiff work remotely two days per week to facilitate her son's medical and therapy appointments and leave the workplace by approximately 3:30 p.m. on scheduled on-site days. The proposed arrangement was estimated to continue for approximately six months, pending reevaluation, and arose from Plaintiff's caregiving responsibilities rather than any physical or mental inability of Plaintiff to perform her job duties.

33. Plaintiff expressly advised Defendant that she would personally attend all major lifestyle events in their entirety, remain accessible to residents, staff, and management, and coordinate her proposed remote working days with management on a weekly basis to accommodate the community's event schedule.

34. At all times pertinent, Plaintiff was qualified for her Lifestyle Director position and remained able and willing to personally perform the essential functions of that position, including its in-person event responsibilities. Plaintiff did not request

to be excused from planning, attending, supporting, or otherwise performing the in-person lifestyle events for which she was responsible.

35. Plaintiff designed her proposed schedule to permit her to personally perform all of her regular duties, including planning, coordinating, attending, and executing in-person lifestyle events, without requiring another employee to assume any essential function of her position.

36. Defendant acknowledged receipt of Plaintiff's Return-to-Work Form and forwarded it for review.

37. On October 31, 2024, Plaintiff followed up to ask whether she was cleared to return to work on November 4, 2024.

38. On November 1, 2024, Defendant told Plaintiff that its response would not be available until November 4, 2024, at the latest.

39. Plaintiff was not restored to work on November 4, 2024.

40. Defendant never informed Plaintiff that her proposed scheduling arrangement had been denied and never directed or permitted her to return under her pre-leave schedule. Instead, Defendant's Human Resources personnel instructed Plaintiff not to report to the workplace until authorized to do so while Defendant continued reviewing her proposed arrangement.

41. Plaintiff did not condition her continued employment upon Defendant's approval of the proposed scheduling arrangement and remained willing and able to return to her pre-leave position under her prior schedule if Defendant declined her request. Had Defendant declined Plaintiff's proposed scheduling arrangement and

instructed her to return under her prior full-time, on-site schedule to remain employed, Plaintiff would have done so.

42. On November 7, 2024, Defendant's Human Resources representative, Arlen Hernandez, spoke with Plaintiff regarding her return and the proposed schedule.

43. During the November 7, 2024 conversation, Plaintiff explained that if an in-person event required her presence on a proposed remote working day, she could adjust her remote schedule to personally attend the event. Plaintiff further explained that she could arrive on-site as early as 8:00 a.m. on her scheduled in-person working days and use early morning hours for administrative tasks such as editing the newsletter, responding to emails, and updating the website and social media.

44. Plaintiff repeatedly confirmed that she would remain personally responsible for attending and supporting the community's in-person lifestyle events, including events occurring on evenings and weekends, and that she would adjust her proposed schedule as necessary to fulfill those responsibilities.

45. Defendant continued reviewing Plaintiff's Return-to-Work Form for weeks after her FMLA leave ended, including through at least November 11, November 14, November 19, and November 25, 2024.

46. On November 25, 2024, Plaintiff reiterated that her requested on-site hours were flexible, that she could remain on-site until approximately 4:00 p.m. if needed, that she would attend all Lifestyle Events from planning through execution and breakdown, and that she would attend weekend events. Plaintiff further advised Defendant that on proposed remote working days she would remain available between

approximately 8:30 a.m. and 1:30 p.m. and again between 3:30 p.m. and 6:30 p.m., or as otherwise necessary to accomplish her job responsibilities.

47. Instead, while Plaintiff remained out of work awaiting reinstatement, Defendant focused on whether Plaintiff's position should be revised or restructured to include additional sports-related activities and to require a full-time on-site presence.

48. Upon information and belief, former Office Manager, Tatiana Francois ("Francois"), who worked near Churchill, overheard Churchill suggest to community board members and others that restructuring Plaintiff's Lifestyle Director position could provide a means to avoid reinstating Plaintiff and legal responsibilities associated with Plaintiff's return from leave and her relationship with her disabled son.

49. Upon information and belief, Francois also overheard discussions that Plaintiff's return had become complicated because of her anticipated schedule flexibility and recurring issues involving Plaintiff's child's medical condition and that management did not want to continue dealing with those issues.

50. The asserted restructuring arose during the same period in which Defendant was withholding Plaintiff's reinstatement and scrutinizing her son's disability, therapy schedule, and Plaintiff's caregiving responsibilities.

51. On December 6, 2024, Plaintiff again confirmed that she remained ready to return to work, that she was continuing to respond to residents, and that she would account for weekend event work within her schedule to reduce further conflict over remote days.

52. Throughout the return-to-work process, Plaintiff repeatedly asked to resume work and to speak with Churchill about her return. Defendant's Human Resources personnel instructed Plaintiff not to report to the workplace until authorized and advised that they would follow up.

53. While awaiting permission to return, Plaintiff continued responding to work-related requests.

54. Beginning with her scheduled return date of November 4, 2024, Plaintiff remained willing and able to return under her prior full-time, on-site schedule if Defendant declined her proposed scheduling flexibility.

55. Plaintiff never refused an express instruction to return to work under her pre-leave schedule, and Defendant never advised Plaintiff that she would be terminated unless she reported under that schedule.

56. Defendant nevertheless did not restore Plaintiff to her pre-leave position or an equivalent position.

57. On December 11, 2024, Defendant’s representatives, Heather Battey and Susan Musson-Babb, informed Plaintiff that her employment was terminated.

58. Defendant attributed the termination to a restructuring or revision of the Lifestyle Director role and to the asserted need for a full-time, on-site employee with an increased sports component. During the termination call, Defendant also told Plaintiff that she was not qualified for the restructured position.

59. Defendant has not identified any performance-based reason for Plaintiff's termination. The events leading to Plaintiff’s termination centered instead on

Plaintiff's FMLA leave, her son's disability, Plaintiff's return from leave, and the alleged restructuring of her position.

60. Plaintiff's termination occurred approximately five weeks after the scheduled expiration of her approved FMLA leave and after Defendant had kept her out of work throughout the return-to-work review.

61. Following her termination, Plaintiff applied for the restructured Lifestyle/Recreation Director position at The Isles of Collier Preserve and also applied for another Lifestyle Director position. Defendant did not respond to her applications or afford her an opportunity to return.

62. Upon information and belief, the restructured position at The Isles of Collier Preserve was offered at approximately $75,000.00 per year, approximately $5,000.00 more than Plaintiff's prior compensation, and retained many of the responsibilities Plaintiff had previously performed.

63. Plaintiff possessed substantial qualifications for the restructured Lifestyle/Recreation Director position, including its proposed sports-related responsibilities. She holds a master's degree in Sports Management, played Division I collegiate tennis at the University of South Carolina, and has more than fifteen years of tennis instruction experience, including at country clubs and luxury resorts. At The Isles of Collier Preserve, Plaintiff managed tennis and pickleball schedules and leagues, met regularly with the Tennis and Pickleball Committees, coordinated a charity tennis event, and organized resident trips to the Miami Open.

64. Defendant's assertion that Plaintiff lacked qualifications for the restructured position, despite her sports management education and extensive tennis and recreation experience, together with the timing of the restructuring, the statements attributed to Churchill, the absence of a performance-based termination reason, and Defendant's handling of Plaintiff's subsequent applications, support an inference that Defendant's stated explanations were pretextual.

65. Defendant subjected Plaintiff to adverse employment actions because of her known relationship and association with her disabled son and because of assumptions concerning the impact of her son's disability and related caregiving responsibilities on Plaintiff's continued employment, rather than any demonstrated failure by Plaintiff to satisfactorily perform her job duties.

66. Defendant also treated Plaintiff adversely because she exercised FMLA rights to care for her son and sought restoration at the conclusion of her protected leave.

## COUNT I
## FMLA Interference

67. Plaintiff incorporates and re-alleges paragraphs 1 through 66 as if fully set forth herein.

68. At all times pertinent, Defendant was a covered employer and Plaintiff was an eligible employee under the FMLA.

69. Plaintiff exercised her rights under the FMLA by taking approved leave beginning August 5, 2024, to care for her son with a serious health condition and by seeking to return to employment on November 4, 2024, her scheduled return date.

70. Upon conclusion of her FMLA leave, Plaintiff sought restoration to her pre-leave position or an equivalent position with equivalent pay, benefits, and other terms and conditions of employment, as provided by 29 U.S.C. § 2614(a)(1).

71. Plaintiff timely notified Defendant of her intent and readiness to return and submitted the requested return-to-work documentation before her scheduled November 4, 2024 return date.

72. As of her scheduled November 4, 2024 return date, Plaintiff remained willing and able to resume her pre-leave full-time, on-site schedule if Defendant declined her proposed scheduling flexibility.

73. Defendant interfered with Plaintiff's FMLA restoration rights by failing to restore her to her pre-leave position or an equivalent position following the scheduled expiration of her protected leave, despite her readiness and ability to return under her prior schedule, and by instructing her not to report while withholding a decision on her proposed scheduling flexibility.

74. Defendant continued withholding Plaintiff's return to employment for weeks after the scheduled expiration of her approved leave while reviewing her proposed scheduling arrangement and considering restructuring or replacing her position.

75. Defendant thereafter terminated Plaintiff's employment rather than restoring her to her pre-leave position or an equivalent position, notwithstanding Plaintiff's repeated efforts to resume employment.

76. Defendant's asserted post-leave restructuring of Plaintiff's position did not extinguish Plaintiff's statutory restoration rights.

77. Defendant's interference caused Plaintiff prejudice, including lost wages and employment benefits she would have earned had she been timely restored and continued in employment. Further, Defendant paid Plaintiff no compensation between her scheduled November 4, 2024 return date and her December 11, 2024 termination, during which period Defendant did not permit her to resume employment.

78. Defendant's violations of the FMLA were knowing and willful.

79. As a direct and proximate result of Defendant's unlawful interference, Plaintiff suffered lost wages and employment benefits beginning when Defendant failed to restore her following her approved leave, and continuing after Defendant terminated her employment, together with other actual monetary losses recoverable under the FMLA.

WHEREFORE, Plaintiff, Tamara Sutton, demands judgment against Defendant, FirstService Residential Property Management, Inc., f/k/a FirstService Residential Florida, Inc., for back pay, front pay, lost past and future employment benefits, liquidated damages, prejudgment interest as permitted by law, reasonable

attorneys' fees and costs, and any other legal and equitable relief as the Court deems just and proper.

## COUNT II
## FMLA Retaliation

80. Plaintiff incorporates and re-alleges paragraphs 1 through 66 as if fully set forth herein.

81. Plaintiff engaged in a statutorily protected activity by requesting and taking FMLA leave to care for her son and by seeking restoration to employment at the conclusion of that leave.

82. Defendant knew of Plaintiff's protected FMLA activity because Defendant approved the leave, administered the return-to-work process, and communicated with Plaintiff regarding her return.

83. Defendant subjected Plaintiff to adverse employment actions after and because of her protected FMLA activity, including instructing her not to report to work following her approved leave, withholding her return to employment, and terminating her employment. Defendant's consideration of restructuring or replacing Plaintiff's position during the return-to-work process further supports an inference of retaliatory motive.

84. The temporal proximity between Plaintiff's protected leave and termination, Defendant's prolonged focus on her post-leave caregiving obligations, the contemplated but unimplemented 30-day trial, the statements described above

regarding restructuring as a way to avoid Plaintiff's reinstatement, and the absence of a performance-based termination reason support a causal connection.

85. Defendant's asserted restructuring and full-time on-site explanations were pretextual. Defendant instructed Plaintiff not to return, never offered her the opportunity to resume her prior schedule, and terminated her employment while asserting that she lacked qualifications for a sports-related role despite her substantial experience. Together with the statements concerning restructuring as a means of avoiding reinstatement, these circumstances support an inference that Plaintiff's exercise of FMLA rights was a but-for cause of Defendant's adverse employment decisions.

86. Plaintiff's exercise of FMLA rights was a but-for cause of Defendant's adverse actions and termination.

87. Defendant’s violations of the FMLA were knowing and willful.

88. As a direct and proximate result of Defendant's retaliation, Plaintiff suffered lost wages and employment benefits beginning when Defendant failed to restore her following her approved leave, and continuing after Defendant terminated her employment, together with other actual monetary losses recoverable under the FMLA.

WHEREFORE, Plaintiff, Tamara Sutton, demands judgment against Defendant, FirstService Residential Property Management, Inc., f/k/a FirstService Residential Florida, Inc., for back pay, front pay, lost past and future employment benefits, liquidated damages, prejudgment interest as permitted by law, reasonable

attorneys' fees and costs, and any other legal and equitable relief as the Court deems just and proper.

## COUNT III
## Associational Disability Discrimination Under the ADA

89. Plaintiff incorporates and re-alleges paragraphs 1 through 66 as if fully set forth herein.

90. At all times pertinent, Defendant was an employer and covered entity within the meaning of the ADA.

91. Plaintiff was qualified for her Lifestyle Director position and remained able and willing to personally perform its essential functions, including planning, coordinating, attending, and supporting the community's in-person lifestyle events, without transferring essential duties to coworkers.

92. Had Defendant declined her proposed scheduling flexibility, Plaintiff was willing and able to resume her prior full-time, on-site schedule.

93. At all times pertinent, Plaintiff's son, H.B., had a disability within the meaning of the ADA, and Defendant knew of both H.B.'s disability and Plaintiff's relationship and association with him.

94. The ADA prohibits an employer from excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association. 42 U.S.C. § 12112(b)(4).

95. Defendant discriminated against Plaintiff because of her known relationship and association with her disabled son by withholding her return to employment, treating the anticipated demands of her son's disability and related caregiving responsibilities as grounds for excluding her from continued employment despite her willingness and ability to return under her prior schedule, and ultimately terminating her employment under the asserted justification of restructuring her position.

96. Defendant acted on stereotypes and assumptions that Plaintiff's son's disability and related medical and therapy needs would cause Plaintiff to be distracted from work, unavailable, unreliable, or otherwise too difficult to employ.

97. The circumstances of Plaintiff's termination, including the statements described above concerning restructuring providing a means of avoiding Plaintiff's reinstatement and related legal responsibilities, Defendant's refusal to permit Plaintiff to return under her original schedule, and Defendant's assertion that Plaintiff lacked qualifications for the restructured position despite her substantial sports-related experience, support an inference of associational disability discrimination.

98. Plaintiff's known relationship and association with her disabled son was a determining factor in Defendant's adverse employment actions against Plaintiff.

99. But for Plaintiff's known association with her disabled son and Defendant's disability-related assumptions about that association, Defendant would not have withheld Plaintiff's return or terminated her employment.

100. Defendant's discriminatory conduct was intentional and undertaken with malice or reckless indifference to Plaintiff's federally protected rights, entitling Plaintiff to an award of punitive damages to the extent permitted under the ADA.

101. As a direct and proximate result of Defendant's unlawful discrimination, Plaintiff has suffered damages consisting of past and future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, loss of dignity, humiliation, and other non-pecuniary losses and intangible injuries.

WHEREFORE, Plaintiff, Tamara Sutton, demands judgment against Defendant, FirstService Residential Property Management, Inc., f/k/a FirstService Residential Florida, Inc., for all damages to which she may be entitled, including, but not limited to:

(a) entry of a judgment in favor of Plaintiff and against Defendant;

(b) an order reinstating Plaintiff to her former position or an equivalent position, together with restoration of her seniority, service credit, employment benefits, and other rights retroactive to the date of the unlawful employment actions, or, in the alternative, an award of front pay in lieu of reinstatement;

(c) an award of back pay, including all sums of money Plaintiff would have earned, together with such increases to which she would be entitled had she not been discriminatorily discharged, and interest thereon;

(d) an award of consequential pecuniary losses, including reasonably incurred job search expenses, replacement health insurance expenses, and medical

expenses caused by the loss of employment-related benefits, to the extent recoverable and proven;

(e) compensatory damages including, but not limited to, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, loss of dignity, humiliation, and other non-pecuniary losses;

(f) an award of punitive damages to the extent permitted by the ADA;

(g) an award of reasonable attorney's fees and all costs incurred herein; and

(h) any other legal and equitable relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

*s/ Morgan B. Jones*
Bradley P. Rothman, Esq.
Florida Bar No.: 0677345
brothman@weldonrothman.com
mfalcone@weldonrothman.com
Morgan B. Jones, Esq.
Florida Bar No.: 1035318
mjones@weldonrothman.com
mfalcone@weldonrothman.com
WELDON & ROTHMAN, PL
2548 Northbrooke Plaza Drive
Naples, Florida 34119
Tel: (239) 262-2141
Fax: (239) 262-2342
*Counsel for Plaintiff*